**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRIS KING,** | : | **CIVIL NO. 1:10-CV-1595** |
| | : | |
| **Petitioner,** | : | **(Judge Jones)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **JEROME WALSH, et al.,** | : | |
| | ; | |
| **Respondents.** | : | |

**REPORT AND RECOMMENDATION**

**I.**     **Statement of Facts and of the Case**

   **A.**     **Chris King's Crimes**

   This case involved the cruel betrayal of a fundamental trust, the trust between a parent and a child, a trust betrayed over a span of years by a father's sexual exploitation of his own daughter.

   This betrayal of trust, this abuse of a child by her parent, was described by the Pennsylvania Superior Court in the following terms its decision affirming the petitioner's conviction:

   A.B., [King's] biological daughter, was sixteen years old when she
   testified to the following events.  Prior to August 9, 1999, when [King]
   moved to live with another woman, [King] lived with A.B., her mother,
   and her two older brothers.  From the time that A.B. was four or five
   years old until she was approximately thirteen years old, her mother was
   ill and often was hospitalized.  [King] started sexually abusing A.B.
   when she was between four and five years old.  At that time, [King] would place "his

finger up inside" of A.B., and would ask, "Do you like it?"  He would also touch her breasts.  When A.B. was approximately seven years old, [King] started to place his penis inside her vagina and occasionally engaged in oral sex.  This conduct was frequent and continued until [King] left in 1999.

When A.B. was approximately six years old, her mother noticed that she was sore and bleeding in her vaginal area.  When questioned, A.B. told her that her father was sexually abusing her.  Her mother became "very upset," grabbed a baseball bat, and left. . . .  The mother returned with [King] who was "crying and got down on his knees to apologize to [the victim] and promised [her] he'd never do it again.".  [King] ceased the abuse for a few months and then resumed it.

A.B.'s mother, P.B., testified that she suffered from a back injury when A.B. was four or five years old and that the injury caused her to suffer from severe depression.  P.B. was on medication and received electro-shock therapy for the condition.  P.B. confirmed the event regarding the baseball bat.

J.M., A.B.'s friend, testified as follows.  She and A.B. were good friends, and J.M. often stayed overnight at A.B.'s home during the time frame of the abuse.  J.M. testified that "sometimes [King] would make comments about [A.B.'s] body parts, and sometimes like he would like call her into a different room, and she would like come back depressed or sad and wouldn't want to do some things that we were doing."  J.M. explained that A.B. would leave for approximately fifteen 'to twenty minutes at [King's] command, and when A.B. returned, she would be sad, would not play, and would want to go to sleep.

T.D., J.M.'s stepsister, also stayed overnight with A.B. during the period of the abuse and corroborated her sister's testimony.  Specifically, T.D. indicated that [King] would ask A.B. to go upstairs with him, she would stay upstairs with him for approximately fifteen minutes, and when A.B. returned, she would lose "all interest in everything, and she was depressed, wanted to go to bed."

Steelton Borough Police Officer John King was assigned to investigate the allegations of abuse against [King].  He interviewed [King] in March

2000.  Officer King stated that [King] denied sexually abusing A.B. and said that he helped A.B. with her hygiene.  [King] admitted to the confrontation with his wife involving the baseball bat.  [King] told Officer King that "he explained to P., his wife, what had happened.  And after he explained to her what had happened, he went inside and apologized to A."  [King] told Officer King that the incident related to [King's] help regarding A.B.'s hygiene.

A.B. has a sister, L.F., who is [King's] biological daughter from his first marriage and who was twenty-nine years old when she testified at trial.  [King] was not involved in L.F.'s life from the time she was four years old until she was ten years old.  When she was ten years old, she would see [King] on weekends. [King] immediately started to sexually abuse L.F. by touching her vaginal area. [King] again disappeared from L.F.'s life, and when she was thirteen years old, she started to visit him again.  At that time, [King] started to have sexual intercourse with her.  Occasionally, the abuse also would involve oral sex.  The abuse stopped when she was fifteen because L.F. stopped seeing him.  A.B. was a toddler at the time.

(Doc. 10, Ex. D.)

Thus, the evidence amassed against King implicating him in the long-standing, serial, sexual abuse of his own children was substantial and compelling.  That evidence consisted of the testimony of A.B., the victim of this sexual exploitation who described an eight-year pattern of abuse at King's hands.  A.B.'s testimony was corroborated by two playmates, who had observed a disturbing pattern of toxic contacts between King and this child.  This abuse was further confirmed by King's ex-wife, who corroborated that she had confronted King about this sexual misconduct, had threatened him with a baseball bat, and had obtained from King a short-lived

promise to refrain from exploiting this child. Further, L.F., King's biological daughter from a prior marriage, testified that she, too, was subjected to repeated acts of sexual abuse by her father of the span of many years. Finally, King's illicit sexual contact with A.B. was confirmed, in part, during a police interview of King, an interview in which King acknowledged making sexually inappropriate comments regarding his daughter and admitted engaging in sexual contact with A.B., while implausibly asserting that he was merely assisting her with her personal hygiene.

Armed with this information, in September of 2000 local authorities charged King with a battery of offenses, including rape, involuntary deviate sexual intercourse, aggravated indecent assault, and corruption of minors. As the case proceeded to trial, the Commonwealth placed defense counsel on notice that numerous witnesses had come forward in the course of the investigation providing information regarding other episodes of inappropriate sexual involving King. (Id., Ex. N.) Alerted to the existence of this other compelling evidence, and this array of additional witnesses, defense counsel filed a motion *in limine* seeking to exclude this proof. That motion was granted, in large measure, and only one witness, L.F., A.B.'s older sister, was permitted to testify at trial to a similar pattern of sexual abuse that she had endured at King's hands when she was a child.

###### B.    King's Trial, Conviction and Sentencing

King proceeded to trial on these charges on November 5, 2001. (Docs. 10-4, 10-5 and 10-6 .) At this trial, the Commonwealth presented six witnesses. These witnesses included the victim in this case, A.B., who testified to the sexual abuse she endured at King's hands. (Id.) A.B.'s mother, King's estranged wife, P.B., also testified that she had uncovered graphic evidence of physical, sexual abuse of her daughter while bathing the child, and had confronted King with a baseball bat, threatening him if he ever harmed the child again. (Id.) According to P.B., King acknowledged inappropriately touching A.B., swore to her that he would stop abusing the child, and apologized to A.B. for his misconduct in her mother's presence. (Id.) This incident was further, independently corroborated by an investigating police officer, John King, who testified that Chris King confirmed in an interview this confrontation between himself and his estranged wife, and acknowledged genital contact with his minor daughter, but attributed that contact to efforts to help the child with her "hygiene." (Id.)

However, other witnesses, including A.B.'s playmates and siblings, placed a far more sinister light on King's conduct, testifying to sexually suggestive comments and conduct engaged in by King towards A.B. in their presence. Furthermore, over King's objections, the trial judge permitted L.F., A.B.'s older sister, to testify to a similar

pattern of sexual abuse that she had endured at King's hands when she was a child. (Id.)

For his part, at trial King urged his counsel to call character witnesses as part of his defense counsel, but counsel made a strategic judgment to refrain from eliciting character witness testimony.   This tactical defense choice was driven by the knowledge that the Commonwealth was prepared to call numerous witnesses who would have testified to other instances of sexually inappropriate conduct by King. Having successfully excluded much of that evidence from the trial of this case through a motion *in limine*, defense counsel was reluctant to place King's character in issue in this fashion in the defense case, a course of action which may well have re-opened the door to the admission of these other bad acts at trial.

Following the presentation of this evidence, the jury returned a verdict, convicting King of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and corruption of minors.   On February 22, 2002, following a sentencing hearing which detailed the victim impact of King's crimes, King was sentenced to serve an aggregate sentence of 10 years and nine months to twenty two years in prison for his role in this sexual exploitation of his own child.  (Id., Ex. B, p. 130.)

## C.   Post-Conviction Proceedings in State Court

In the wake of this conviction and sentence, King filed post-trial motions alleging that the trial court had erred in its evidentiary ruling permitting the victim's sister to testify that she, too, had been sexually abused by King, and asserting that he had been ineffectively assisted by his trial counsel.  (Id., Ex. C. )  That motion was denied by the trial judge, and King appealed this decision to the Pennsylvania Superior Court.   On November 10, 2003, the Superior Court rejected King's appeal and affirmed his conviction and sentencing.  (Id., Ex. D.)

King then filed a petition for allowance of appeal to the Pennsylvania Supreme Court.  (Id., Ex. E.)  On May 4, 2004, that petition was granted, in small measure, with respect to one sentencing issue, and the case was then remanded to the Superior Court for further consideration of that issue.  (Id., Ex. F.)  On remand, the Superior Court affirmed the trial judge's determination that King constituted a sexually violent predator in an opinion entered on September 18, 2004.  (Id., Ex. H.)  King filed a petition for allowance of appeal with the Pennsylvania Supreme Court challenging the affirmance of this sentencing determination, (Id., Ex. I), which was denied by that court on March 8, 2005.  (Id., Ex. J.)

Having exhausted his direct appeals, King filed a petition for relief under Pennsylvania's Post Conviction Relief Act (PCRA), renewing his challenges to the

constitutionality of his conviction, the lawfulness of the trial court's evidentiary rulings, and the ineffectiveness of his trial counsel. (<u>Id</u>., Ex. K.) King's initial PCRA petition was a multi-faceted pleading, which raised a dozen claims of error relating to the trial and sentencing of the petitioner, claims that closely paralleled those raised in this petition. (<u>Id</u>.)

Counsel was appointed to represent King in connection with this petition in November 2005, but later filed a "no merit" letter and moved to withdraw. (<u>Id</u>., Ex. L.) This motion was initially granted by the trial court, which also dismissed King's petition. On appeal, the Pennsylvania Superior Court affirmed the dismissal of most of the claims set forth in King's PCRA petition, but remanded the case to the trial judge for consideration of two narrow issues: (1) whether trial counsel was ineffective for failing to call character witnesses, and (2) whether trial counsel was ineffective for failing to call a physician witness, Dr. Greenwald, who had interviewed the victim regarding inconsistencies in her statements. (<u>Id</u>., Ex. M.)

On January 9, 2008, a hearing was held on these remaining issues in King's state PCRA petition. (<u>Id</u>., Ex. N.) At this hearing, King's trial counsel and the state prosecutor both testified, and King's trial counsel provided the court with the rationale for these tactical choices which the defense made at trial. With respect to the decision not to call character witnesses on behalf of King, trial counsel explained that he was

confronted at trial with an unusual and compelling circumstance. Trial counsel knew from the litigation of a motion *in limine* that the Commonwealth stood ready to call a series of witnesses to testify regarding King's penchant for inappropriate sexual contact with others. Indeed, trial counsel had successfully excluded much of this proof from the trial of the case through a motion *in limine*. In trial counsel's view, calling character witnesses would re-open the door to this proof of other sexual misconduct by King, evidence which would have a devastating, adverse impact upon the defense at trial. (Id.)

Trial counsel also explained why he had not called Dr. Greenwald, who had interviewed the victim, to testify regarding inconsistencies in her statements. According to trial counsel, during cross examination, the victim had acknowledged lying to Dr. Greenwald. Therefore, these inconsistences had been acknowledged by the victim herself, who had attributed the inconsistencies to deception. In light of these admissions by the victim, King's trial counsel believed that there was little to be gained and potentially much to be lost by calling Dr. Greenwald as a witness. In particular, trial counsel stated that he had observed Dr. Greenwald testify in other trials of this type, and he knew that the doctor was a skillful witness, who was particularly adept at providing jurors with explanations for inconsistences in child

victim statements, explanations which tended to strongly bolster the testimony of these witnesses by minimizing or explaining away any inconsistencies.  (Id.)

Following this hearing, the trial court entered an opinion and order denying King's petition for state post conviction relief.  (Id., Ex. O.)  In its January 14, 2009, opinion and order the trial court found that the tactical choice made by counsel to avoid re-opening the door to testimony regarding other bad acts by King as a result of calling character witnesses, and the decision for refrain from calling Dr. Greenwald, a skilled witness who would have had an opportunity to explain away alleged inconsistencies in the victim's past statements, did not rise to the level of ineffective assistance of counsel.  (Id.)

## D. King's Appeal of the State Court Ruling Denying Him Post-Conviction Relief

King then appealed the denial of his state petition for post-conviction relief. (Id., Ex. O.)  On December 1, 2009, the Pennsylvania Superior Court denied King's appeal, and affirmed the judgment of the trial court.  (Id., Ex. P.)  In reaching this result the Superior Court specifically considered, and rejected, King's contentions that these two tactical choices by trial counsel relating to the failure to call character witnesses or Dr. Greenwald to testify amounted to ineffective assistance of counsel. Instead, the state appellate found these decisions to be reasonable defense tactical choices given the facts presented to the defense at trial.  (Id.)

King then filed a petition for allowance of appeal with the Pennsylvania Supreme Court. (Id., Ex. Q.) That petition was denied by the Supreme Court on August 11, 2010. (Id., Ex. R.)

### E.   King's Federal Habeas Corpus Petition

Having exhausted his state court remedies, King filed the instant habeas corpus petition on August 17, 2010. (Doc. 1.) Like his prior state PCRA filings, this petition raised approximately a dozen claims of trial error. This broad array of claims can be cast, however, into several categories. First, King assails the effectiveness of his trial counsel, reprising his claims that counsel unreasonably failed to call character witnesses and other medical witnesses at trial. (Id.) Second, King contends that a series of trial court evidentiary rulings and trial management decisions denied him due process. (Id.) Third, King challenges the court's sentence as unreasonable and unfair on a number of scores. (Id.)

This petition is fully briefed by the parties, (Docs. 1, 10 and 15), and is, therefore, ripe for resolution. Having carefully considered the arguments of the parties, for the reasons set forth below, we conclude that King's petition should be denied.

## II.   Discussion

## A.   State Prisoner Habeas Relief–The Legal Standard

A state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which provides in part as follows

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> **(A)** the applicant has exhausted the remedies available in the courts of the State;
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b).

## (1.)   Substantive Standards For Habeas Petitions

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief.  At the outset, a petition must satisfy exacting substantive standards to warrant relief.  Federal courts may "entertain an application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. See, e.g., Reed v. Farley, 512 U.S. 339, 354 (1994). Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. See Priester v. Vaughan, 382 F.3d 394, 401-02 (3d Cir. 2004).

### (2). <u>Deference Owed to State Court Rulings</u>

These same principles which inform the standard of review in habeas petitions and limit habeas relief to errors of a constitutional dimension also call upon federal courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings. There are two critical components to this deference mandated by 28 U.S.C. § 2254.

First, with respect to legal rulings by state courts, under §2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; see 28 U.S.C. §2254(d)(1); or (2) was "based upon an unreasonable determination of the facts," see 28 U.S.C. §2254(d)(2). Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts. See Rice v. Collins, 546 U.S. 333, 338-39 (2006); see also Warren v. Kyler, 422 F.3d 132, 139-40 (3d Cir. 2006); Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. See 28 U.S.C. §2254(e)(1). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings. See, e.g., Maggio v. Fulford, 462 U.S. 111, 117 (1983) (per curiam); Demosthenes v. Baal, 495 U.S. 731, 734-35 (1990).

This principle mandating deference to state court factual determinations specifically applies to state court findings relating to the competence of criminal

defendants.  Thus, federal courts are not free to substitute their views for the findings

of state judges on issues of competence to stand trial; <u>Maggio v. Fulford</u>, 462 U.S.

111, 117 (1983), competence to waive rights; <u>Demosthenes v. Baal</u>, 495 U.S. 731,

734-35 (1990), or whether the defendant's mental competence affected his ability to

comply with post-conviction petition filing deadlines.  <u>Nara v. Frank</u>, 488 F.3d. 187,

200-01 (3d Cir. 2007)(state court finding that defendant's mental incompetence

interfered with his ability to file timely petition entitled to a presumption of

correctness.)  Rather, these factual findings must be presumed to be correct unless the

petitioner can show by clear and convincing evidence that these factual findings were

erroneous.  <u>See</u> 28 U.S.C. §2254(e)(1).

### (3.)   <u>Ineffective Assistance of Counsel, The Legal Standard</u>

These principles apply with particular force to claims of ineffective assistance

of counsel.  A defendant like this petitioner faces an exacting burden when he

collaterally challenges a conviction and sentence based upon the alleged

ineffectiveness of counsel.  As the Supreme Court has noted:

> A convicted defendant's claim that counsel's assistance was so defective
> as to require reversal of a conviction or... sentence has two components.
> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel
> was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment.  Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that
> counsel's errors were so serious as to deprive the defendant of a fair trial,

> a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or... sentence resulted from a breakdown in the adversary process that renders the results unreliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).

Thus, in order to succeed in a claim of ineffective assistance of counsel, the petitioner must show both "cause"; that is, a legally deficient performance by counsel, and "prejudice" resulting from that ineffective performance.  With respect to the first element of this test, in assessing the competence of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential, " Id. at 689, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.   A petitioner must satisfy both of the Strickland prongs in order to maintain a claim of ineffective counsel.  George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001).

Therefore, at the outset, Strickland  requires a petitioner to "establish first that counsel's performance was deficient." Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001).  This threshold showing requires a petitioner to demonstrate that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. Id.   Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Id.  However, in making this assessment "[t]here is a 'strong

presumption' that counsel's performance was reasonable." Id. (quoting Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996)).

But a mere showing of deficiencies by counsel is not sufficient to secure habeas relief. Under the second Strickland prong, a petitioner also "must demonstrate that he was prejudiced by counsel's errors." Id. This prejudice requirement compels the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id.

Thus, as set forth in Strickland, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness." 466 U.S. at 688. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689). The petitioner must then prove prejudice arising from counsel's failings. "Furthermore, in considering whether a petitioner suffered prejudice, '[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the

evidence at trial:  "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."'"  Rolan v. Vaughn,  445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696.).  Therefore, the prejudice analysis compelled by Strickland specifically calls upon us to critically assess the strength of the government's case since "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Id.

Although sometimes couched in different language, the standard for evaluating claims of ineffectiveness under Pennsylvania law are substantively consistent with the standard set forth in Strickland.  See Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); see also Werts v. Vaugh, 228 F.3d 178, 203 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent.").  Accordingly, a federal court reviewing a claim of ineffectiveness of counsel brought in a petition under 28 U.S.C. § 2254 may grant federal habeas relief if the petitioner can show that the state court's adjudication of his claim was an "unreasonable application" of Strickland.  Billinger v. Cameron, 2010 U.S. Dist. LEXIS 63759, at *11 (W.D. Pa. May 13, 2010).  In order to prevail against this standard, a petitioner must show that the state court's decision "cannot

reasonably be justified under existing Supreme Court precedent." Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); see also Waddington v. Sarausad, __ U.S. __, 129 S. Ct. 823, 831 (2009) (where the state court's application of federal law is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted).  This additional hurdle is added to the petitioner's substantive burden under Strickland.  Thus, as the Supreme Court has observed a "doubly deferential judicial review . . .  applies to a Strickland claim evaluated under the § 2254(d)(1) standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). See also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas.").

Furthermore, in a case such as this, where a state court judgment rests upon factual findings, it is also well-settled that:

> A state court decision based on a factual determination, . . . , will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding.  Miller-El v. Cockrell, 537 U.S. 322 (2003).  We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Campbell v. Vaughn, 209 F.3d 280, 285 (3d Cir.2000).  A state court's finding of the absence of discriminatory intent is "a pure issue of fact accorded significant deference," which will not be overturned unless clearly erroneous.  Miller-El, 123 S.Ct. at 1040-41 (citation omitted).

Rico v. Leftridge-Byrd,  340 F.3d 178, 181 (3d Cir. 2003).

### B.      King Was Effectively Represented at Trial

Judged against these guideposts, we find that King's petition for writ of habeas corpus fails to meet the exacting standards required for post-conviction relief in federal court.  Turning first to King's principal claims of ineffectiveness, his assertion that trial counsel erred in failing to call character witnesses and other medical witnesses, we find that these tactical choices were reasonable and appropriate under the circumstances.

In particular, the decision to refrain from calling character witnesses reflected a sound strategic judgment in the factual context of this case.  Defense counsel was aware at trial that the prosecution had an array of witnesses in the wings, who stood ready to testify that King had engaged in other episodes of inappropriate conduct.  In fact, defense counsel had successfully excluded much of this evidence through a pre-trial motion *in limine*.  Counsel recognized that the presentation of character witnesses "would have enabled the prosecution to ask about specific instances of noncriminal misconduct" by King, Alexander v. Shannon, 163 F. App'x 167, 175 (3d Cir. 2006), and would have re-opened the door to the admission of this devastating evidence of other similar bad acts by King at this trial.  Presented with such a dilemma, the United States Courts of Appeals for the Third Circuit has expressly held that the precise

choice made here, to forego character witnesses, is an appropriate tactical decision that does not entitle a disappointed petitioner to habeas corpus relief on the grounds of ineffective assistance of counsel. Alexander v. Shannon, 163 F. App'x 167, 175 (3d Cir. 2006).

Likewise, the decision to forego calling Dr. Greenwald as a witness to testify to inconsistencies in the victim's prior statements was a sound tactical choice. As King's trial counsel explained, these contradictions had been thoroughly aired in the cross examination of the witness, and counsel's past experience had shown that Dr. Greenwald, a skilled expert trial witness and advocate for children, was adept at minimizing such inconsistencies. Given the compelling quality of the Commonwealth's case, it was manifestly in the petitioner's interest to avoid taking steps which would have diminished the impact of any alleged inconsistencies in the victim's prior statements. Counsel's tactical choice to refrain from calling Dr. Greenwald was designed to achieve this goal, and was eminently reasonable given trial counsel's past experience with this expert witness. Therefore, this choice did not rise to the level of an error, much less error of such a magnitude that it would justify habeas corpus relief.[1]

---

[1]King also alleges that counsel was ineffective for failing to call the victim's treating physician, in the apparent but factually unsupported hope that the doctor would have somehow medically contradicted the victim's claims. However, like

### C.   The Trial Court's Evidentiary Rulings and Trial Management Decisions Did Not Deprive King Due Process

King's petition then catalogues a series of trial court evidentiary rulings and trial management decisions which he alleges denied him due process at trial.  Thus, King insists that the trial judge erred in:  (1) allowing the victim's older sister to testify to a pattern of similar sexual abuse which she endured at King's hands; (2) permitting the victim's friends to testify regarding the profound changes in her demeanor following episodes in which King summoned the child into private encounters in the home, encounters that the victim testified entailed sexual abuse; (3) accepting testimony, including hearsay testimony from the trial, at King's sentencing hearing; and (4) not allowing aggressive cross examination of the victim regarding her prior sexual history.

King's efforts to convert these various state trial court evidentiary rulings into matters of constitutional magnitude warranting habeas corpus relief are judged against an exacting threshold.  "[I]n order to show that an evidentiary error of this type rose to the level of a due process violation, [the petitioner must] contend[] that it was of such magnitude as to undermine the fundamental fair ness of the entire trial.

---

the state courts, we find that King's argument in this regard is wholly speculative, and does not demonstrate either ineffectiveness, or prejudice to the defense, required elements for federal habeas corpus relief.

McCandless v. Vaughn, 172 F.3d 255, 262 (3d Cir.1999); Lesko v. Owens, 881 F.2d 44, 51–52 (3d Cir.1989)." Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001).  King has made no such showing here, nor can he.  Indeed, the evidentiary rulings made in this case were manifestly proper and fell squarely within the broad range of discretion afforded to trial judges.   Thus, we can discern no error in permitting testimony regarding the observed effect that these episodes of abuse had on the victim. Such evidence is plainly relevant and corroborative of the victim.  Similarly, the rules of evidence permit testimony like that presented by the victim's sister which tended to prove that King's actions were part of a larger scheme of sexually predatory behavior victimizing his own children.  Furthermore, the trial court's restrictions on testimony regarding the victim's prior, and unrelated, sexual history does not offend due process.  Rather, those limitations were compelled by Pennsylvania's Rape Shield Statute, a law whose constitutionality has been acknowledged both by this court, Nyamwange v. Fisher, 1:10-CV-0463, 2011 WL 2496213, *14 (M.D. Pa. June 23, 2011), and by the United States Supreme Court.  Michigan v. Lucas, 500 U.S. 145 (1991)(construing Michigan Rape Shield law).

King also errs when he contends that the trial judge improperly allowed an Assessor to testify to hearsay at the sentencing hearing conducted in this case.  In particular, King is incorrect when he suggests that any consideration of hearsay at

sentencing violates his rights.  Quite the contrary, it has frequently been held that trial courts may consider reliable hearsay evidence when making sentencing determinations.   In this regard, "[t]he admission of hearsay statements in the sentencing context is subject to the requirements of the Due Process Clause.  Under the precedent of this Court, hearsay statements must have some 'minimal indicium of reliability beyond mere allegation.' Kikumura, 918 F.2d at 1102 (citations omitted)." United States v. Robinson, 482 F.3d 244, 246 (3d Cir. 2007).  In short, " 'Hearsay is fully admissible at a sentencing hearing, so long as it has sufficient indicia of reliability.' United States v. Brigman, 350 F.3d 310, 315 (3d Cir.2003)." United States v. Parker, 254 F. App'x 906, 909 (3d Cir. 2007).  In his case, the state courts have correctly concluded that the hearsay relied upon by the Assessor in her testimony at King's sentencing consisted largely of the corroborated statements of the victim, statements which a jury had found possessed sufficient indicia of reliability to carry the government's burden of proof beyond a reasonable doubt.  Such proof is clearly admissible under the due process standards defined by the courts for sentencing proceedings, and King's complaints in this respect are entirely unavailing.

     The other trial management claims made by King are also without merit.  For example, the trial court's decision to refrain from polling the jury is a matter within the board discretion of the court.  Therefore, this claim that King's jury was not

individually polled, whether couched as a due process violation or as an assertion of ineffective assistance of counsel, simply "does not constitute a basis for federal habeas relief." Laird v. Horn, 159 F. Supp. 2d 58, 90 (E.D. Pa. 2001) aff'd and remanded, 414 F.3d 419 (3d Cir. 2005).

Finally, King cannot gain habeas corpus relief by complaining about the jury instructions in his case. Like his other trial management complaints, a habeas corpus challenge to a court's jury charge must meet a demanding legal threshold. It is well-settled that:

> Our analysis of jury instructions claimed to impair a constitutional right "must focus initially on the specific language challenged." Francis v. Franklin, 471 U.S. 307, 315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985); see also Rock v. Zimmerman, 959 F.2d 1237, 1246 (3d Cir.1992) (en banc). The allegedly constitutionally infirm language must be considered in the context of the charge as a whole. See Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); Flamer v. Delaware, 68 F.3d 736, 752 (3d Cir.1995); Kontakis v. Beyer, 19 F.3d 110, 115-16 (3d Cir.1994). The proper inquiry is " 'whether there is a *reasonable likelihood* that the jury has applied the challenged instructions in a way' that violates the Constitution." Estelle, 502 U.S. at 72, 112 S.Ct. at 482 (quoting Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)) (emphasis added); see also Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994); Flamer, 68 F.3d at 752.

Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997).

In this case, the jury instructions given to King's jury have been assessed by the state courts and have been found to fully comport with the requirements of state law.

While King has suggested other instructions which he would have preferred to have been given to the jury at his trial he has not shown that the instructions, taken as a whole violated due process in that " 'there is a *reasonable likelihood* that the jury has applied the challenged instructions in a way' that violates the Constitution." Id. Without such a showing, which has not been made in the instant case, King is not entitled to federal habeas corpus relief on these grounds.[2]

### D.    King's Sentencing Claims Are Also Unavailing

Finally, in this petition King attacks his state sentence, arguing that the sentencing court's determination that he constituted a sexually violent predator, and its decision not to merge his rape and involuntary deviate sexual intercourse convictions at sentencing, constituted fundamental error of a constitutional dimension warranting habeas corpus relief.

In this regard, King misconstrues the scope of the Great Writ.  While King invites us to use the writ of habeas corpus to second-guess the sentencing judgments of the state court, it is clear that:

---

[2]We note that in a number of instances King has couched these trial management issues both as due process violations and as ineffectiveness claims since he alleges that trial counsel erroneously failed to object adequately to the trial judge's decisions.  Because we find that none of these discretionary trial management decisions, individually or combined, rose to the level of a due process violation, we also conclude that counsel did not err in failing to specifically object to these trial management decisions.

[H]abeas challenges to a state court's sentencing discretion are unreviewable by a federal court provided that the sentence lies within the statutory guidelines, it is not based upon arbitrary considerations, and the defendant's constitutional rights were not violated. See Estelle, 502 U.S. at 67–68 (explaining that federal habeas courts are not permitted to review questions of state law); Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (same); Wainwright v. Sykes, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (indicating that questions of state substantive law are not cognizable on federal habeas review); Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (stating that when a state "sentence [is] within the limits set by the statute, its severity would not be grounds for [habeas] relief"); see also Jones v. Superintendent of Rahway State Prison, 725 F.2d 40, 42–43 (3d Cir.1984 court's sentencing discretion was not cognizable in federal habeas petition); Smith v. Kerestes, Civ. A. No. 08–0061, 2009 WL 1676136, at *16 (E.D.Pa. June 15, 2009) (rejecting petitioner's claim that his state sentence was excessive because "absent a Constitutional violation, a federal court has no power to review a sentence in a habeas corpus proceeding unless it exceeds statutory limits").

Temple v. Coleman, 3:12-CV-2615, 2013 WL 4015814, *10 (M.D. Pa. Aug. 6, 2013).

In any event, beyond being generally unreviewable, it appears that the sentencing judgments made in this case were, in fact, correct. For example, the state courts have observed that the decision to characterize King as a sexually violent predator appears to have entailed a careful consideration of all of the relevant statutory criteria prescribed by state law, as well as the facts of this case, which disclosed serial, sexual predation by King upon his own daughters. It is difficult to imagine a more cruelly calculated pattern of sexual predation than a parent's betrayal of a child's trust for his own sexual gratification, and the trial court's finding that this behavior justified

designating King a sexually violent predator seems entirely proper under state law.

Furthermore, King's argument that his rape and involuntary deviate sexual intercourse

charges should have merged for sentencing purposes actually ignores state law which

holds that separate acts of sexual violation and abuse do not merge under state law for

sentencing purposes. See Commonwealth v. Allen, 856 A.2d 1251 (Pa. Super. 2004).[3]

Finally, King's claim in this habeas petition that the registration and notification

provisions of Pennsylvania's Megan's Law are unconstitutional, and that his trial

counsel was ineffective for failing to challenge these state laws, runs afoul of the

principle that these post-sentence registration and notification requirements generally

are not considered cognizable in habeas.  As one court has observed recently:

> Because Megan's Law is not punitive, numerous courts in this District
> have held that the registration requirement does not itself constitute the
> "custody" necessary to implicate federal habeas relief.  See, e.g.,
> Cravener v. Cameron, Civ. No. 08–1568, 2010 WL 235119 (W.D.Pa.
> Jan. 15, 2010); Story v. Dauer, Civ. No. 08–1682, 2009 WL 416277, at
> *1 (W.D.Pa. Feb.18, 2009) (finding a challenge to the Pennsylvania
> Megan's law registration requirements not cognizable in a federal habeas
> proceeding and holding that "[f]or purposes of implementing [the federal
> habeas] statute, the term 'in custody' as been interpreted not to include
> the requirement for registration as a sexual predator."); Bankoff v.
> Pennsylvania, Civ. No. 09–2042, 2010 WL 396096 (E.D.Pa. Feb. 2,

---

[3]Indeed, the implications of King's argument on this score are shocking.
Taken to its extreme, King's position would be that all acts of sexual abuse of a
minor committed over time upon a single victim should merge for sentencing
purposes. The Pennsylvania courts quite correctly reject this position, and so
should we.

2010); see also Brian R. Means, Federal Habeas Manual, § 1:22 (2009) ("Registration pursuant to a sexual offender registration statute does not satisfy the 'custody' requirement.   Nor does the future threat of incarceration for registrants who fail to comply with the registration statute.").   I have been unable to locate a single case in which a court found that a habeas petitioner satisfied the § 2254 "in custody" requirement simply because he was subject to the requirements of a sex offender registration law.   Courts have also held that any constitutional challenge to the Megan's Law designation must be brought in the form of a civil rights claim rather than as a claim seeking habeas relief.   See, e .g., Virsnieks v. Smith, 521 F.3d 707 (7th Cir.2008) (holding that Megan's Law registration requirement did not itself satisfy custody requirement because registration had negligible effects on a petitioner's physical liberty of movement; thus it was insufficient to independently satisfy the custody requirement, even though person was in custody serving sentence for the sex crime that led to registration requirement); Leslie v. Randle, 296 F.3d 518, 521–523 (6th Cir.2002) (stating that courts have rejected uniformly the argument that a challenge to a sentence of registration under a sexual offender statute is cognizable in habeas and holding that, despite the fact that the petitioner was incarcerated at the time of his petition, his challenge to the registration portion of his sentence was not cognizable in habeas).

Diaz v. Pennsylvania, CIV.A. 12-7082, 2013 WL 6085924, *7 (E.D. Pa. Nov. 19, 2013).

In sum, contrary to King's assertions in this petition, the petitioner's conviction is not the product of an unfair trial, an unjust legal system and an ineffective defense. Rather, this conviction and sentence is the inevitable consequence of a pattern of sexual predation by the petitioner, who targeted his own children for serial sexual abuse.   Finding that all of King's concerns have been thoroughly examined, and

concluding that none of these concerns raise matters of constitutional dimension warranting habeas corpus relief, it is recommended that this petition be denied.

### III.   Recommendation

Accordingly, for the reasons set forth above, IT IS HEREBY RECOMMENDED THAT this petition for habeas corpus relief (Doc. 1.) should be DENIED and the Court should decline to issue a certificate of appealability.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 26th day of August, 2014.

/s/ ***Martin C. Carlson***

Martin C. Carlson
United States Magistrate Judge